## MASSACHUSETTS MUT. LIFE INS. CO.
### v.
### HARDWICK et al.
### Civ. No. 1919.

United States District Court,
E. D. Tennessee, S. D.

Nov. 24, 1953.

Chambliss, Chambliss, & Brown, Chattanooga, Tenn., for plaintiff.

Spears, Reynolds, Moore & Rebman, Chattanooga, Tenn., and Hardwick Stuart, Cleveland, Tenn., for defendants.

DARR, Chief Judge.

A declaratory judgment is sought as to a contract of insurance made by plaintiff with defendants' intestate. The contract involved was more correctly described as a single premium life annuity, and the

plaintiff asserts that it was valid and that it has been fully performed. The defendants claim that the contract was invalid by reason of (1) mutual mistake of fact, (2) mental incompetence of the annuitant, (3) ignorance and inexperience of the annuitant, and (4) physical weakness and illness which impaired the use of the annuitant's mental faculties; and for said reasons a rescission of the contract is sought with a refund of the premium claimed to be unearned. A jury was demanded to try the issues.

The contract involved was entered into between the plaintiff and the annuitant on October 1, 1951, and in consideration of a single premium of $40,000 it obligated the plaintiff to pay to the annuitant the sum of $197.70 per month during her life.

The annuitant, Elizabeth P. Hardwick, was the sixty-two year old widow of a former prominent citizen of the community, with three adult sons, two of whom are presently co-administrators of her estate and defendant to this action.

One of her sons, John, was Treasurer of Hardwick Woolen Mills of Cleveland, Tennessee, and her brother-in-law was president of the Mills. The annuitant's husband had likewise been a high official in that business.

The annuitant's husband had died about 1947 and from his estate she inherited a substantial amount of both real and personal property. This estate she had largely disposed of by sale or gift at the time the annuity contract was proposed and at that time she owned $40,000 of preferred stock in the Woolen Mills and not more than $3,000 or $4,000 in cash. She lived with her youngest son, Frank, II, in a modest home which she had given to him.

For several years prior to her death, the annuitant had from time to time consulted her family physician. Dr. Madison Truhit, but except for high blood pressure and excessive weight her ailments were apparently not serious. In 1949, she consulted him for bronchial and asthmatic trouble, and she responded normally to the treatments given her. The following July she called the doctor to her home, at which time she was highly nervous; and a mild sedative was given her. In September she called at his office, and he found her blood pressure up and albumin in her urine. Treatments were given and she was cautioned to reduce her weight. In December 1949, the doctor treated her for colds and minor ailments but did not see her again until her last illness on March 10, 1952, when she called him to come to her home. The doctor says, "On that date, Mrs. Hardwick was lying on the couch in the living room and stated that she had pain in the epigastric area of the abdomen, shortness of breath on exertion. She stated that she thought her trouble was due to overeating. Examination revealed that her blood pressure was still elevated and the exact record is not available in my office, since this was a house call. Examination of the heart revealed nothing significant. Examination of the abdomen revealed tenderness in the epigastric area and over the gall bladder. My impression at this time was that Mrs. Hardwick had an attack of inflammation of the gall bladder due to overeating. Treatment consisted of restricted diet. The patient was instructed to call me if her condition did not improve. The patient was not seen again until after death. On this occasion I was called by Frank Hardwick to see the deceased in the middle of the morning of March twenty-fourth, nineteen fifty-two."

The annuitant is shown to have had certain eccentricities and peculiarities, and such physical infirmities as might be expected of persons of her age. In 1941, during the life of her husband, she spent several months in Sheppard-Enoch Pratt Sanitarium in Baltimore, Maryland, as a mental patient. It was shown that she was in a depressed mental condition, slowed up in her speech and her thinking. Her condition was described as "manic depressive psychosis-depressed phase", which the physician described as

meaning an abnormal discouragement, the idea that something was likely to happen to her without any apparent foundation in fact, and the feeling that somehow something was going to happen to other people and that she was to blame for it.

After several months, she became quite normal again, had a cheerful outlook on life, and felt that she was back to her usual self. She was discharged from the hospital on parole on March 3, 1942, and discharged from parole June 9, 1942.

After the death of her husband, Mrs. Hardwick sold the large family home, and reinvested the proceeds in some smaller properties. One of the houses that she bought she gave to her son Frank, II. She sold a farm to her son Frank, but the consideration is not shown, and she gave her common stock in the Woolen Mills to her grandchildren. She maintained her own bank account and looked after her affairs, consulting with her sons, John and Frank, with whom she lived.

The idea of buying an annuity contract originated with her son John. He talked to her three or four times about it before the insurance agent called on her. She signed the application at a time when John was present.

Within a few days the annuity contract was ready for delivery and was personally delivered by Mr. Parks, plaintiff's agent. John was present at that time also. Mr. Parks had no knowledge that she had high blood pressure or Bright's disease, and was assured that she was in good health. Payment of the premium was made by check of the Woolen Mills, signed by John Hardwick as treasurer and payable to the plaintiff; and was delivered by John personally.

The annuitant died after having been paid five monthly installments, or a total of $988.

Two sons, John H. Hardwick and Frank Hardwick, II, as co-administrators of her estate made demand upon the plaintiff for a return of the premium, less the amount paid to the annuitant during her lifetime. The plaintiff thereupon filed this action seeking to have the validity of the transaction declared; and the defendants thereafter interposed appropriate pleadings to obtain a rescission of the contract.

The case was tried to the Court and a jury.

On the trial of the case the only issue upon which there was any semblance of evidence for a jury was on the mental capacity of the annuitant, and accordingly the following was submitted to the jury for a special verdict: "Was the deceased, Mrs. Elizabeth P. Hardwick, of such unsound mind on October 1, 1951, as to be incapable of understanding and appreciating the effect of the purchase of the annuity contract?"

The jury having received the charge of the Court was unable to agree, and was discharged without reaching a verdict.

The plaintiff has moved the court as follows: "(a) for a judgment in its favor in accordance with its motion for a directed verdict made at the conclusion of all of the proof on the ground that there was no material evidence that at the time the contract was entered into, Elizabeth P. Hardwick was incapable of entering into such contract or mentally incompetent, or (b) in the alternative that the Court withdraw the issue from the jury and render judgment in favor of the plaintiff."

The defendants insist that there is material evidence for the jury on this issue, that they are entitled to a jury trial as a matter of law under Rule 38, Federal Rules of Civil Procedure, 28 U.S. C.A., and that the Court should now declare a mistrial and order the case placed on the calendar for another trial.

As to whether the defendants are entitled to a jury trial as a matter of right is a question of considerable uncertainty. They would not have such right if the issue to be tried is *equitable* in nature.

■ The plaintiff's action is for a declaratory judgment, which is treated as neither legal nor equitable, but the issues raised thereunder may be either legal or equitable. Sanders v. Louisville & N. R. Co., 6 Cir., 144 F.2d 485; Great Northern Life Ins. Co. v. Vince, 6 Cir., 118 F.2d 232, certiorari denied, 314 U.S. 637, 62 S.Ct. 71, 86 L.Ed. 511.

■ The defendants by their answer seek a rescission or cancellation of the contract, relief that is traditionally equitable in its nature. 5 Moore's Federal Practice (2nd Ed.) page 183; Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 137 F.2d 62.

The shadowy line between what are equitable and what are legal issues, and which are therefore triable by a jury as a matter of right, is illustrated by the following cases: American Life Ins. Co. v. Stewart, 300 U.S. 203, 57 S.Ct. 377, 81 L. Ed. 605; Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440; Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176; City of Morgantown, W. Va. v. Royal Ins. Co., 4 Cir., 169 F.2d 713; Hargrove v. American Cent. Ins. Co., 10 Cir., 125 F.2d 225; Pacific Indemnity Co. v. McDonald, 9 Cir., 107 F.2d 446, 131 A. L.R. 208; Prudential Ins. Co. of America v. Strickland, 6 Cir., 187 F.2d 67; Great Northern Life Ins. Co. v. Vince, supra.

■ In the present instance the Court feels that it is not necessary to decide whether the defendants' affirmative defense of "mental incompetence" is a legal issue on which they are entitled to a jury trial as a matter of right. The Court has carefully reviewed and reconsidered the evidence adduced on the trial, the pleadings and all the factors in the case and is of the opinion that there is no competent and sufficient evidence to justify a rescission of the annuity contract.

Whether, therefore, the issue of mental incompetence be treated as legal in nature, so that the defendants could be entitled to a trial by jury, or whether it would be deemed as equitable, the Court concludes that the plaintiff's motion for a directed verdict made at the close of all the evidence should have been sustained, and should now be sustained under the plaintiff's motion for judgment. In view of this holding, the result would be the same if the issue be considered equitable and triable to the Court alone.

The annuity contract was not entered into as a result of any high pressure or persistent salesmanship on the part of the plaintiff's agents. The idea of making such an investment originated with the annuitant's son, John, and his uncle, Frank Hardwick, high officials in the Hardwick Woolen Mills. They had advance information that she was soon to come into the possession of $40,000 from a redemption of her preferred stock in the Mills. John made a family survey about a suitable reinvestment of the funds for his mother. Some members of the family felt that the annuitant had been improvident to a degree in managing her property—or in any event, that she had been unduly generous in donations to relatives.

The $40,000 which she was soon to receive constituted the principal portion remaining from her husband's estate. John and brother-in-law Frank were interested to see that these funds should be placed so as to produce an income, but at the same time be beyond her reach or the reach of relatives. John was also interested to see that her remaining span of life should be made secure, so that she would not become a charge on him and other relatives for support.

The idea of an annuity occurred to him. He mentioned the matter to one brother [1] and to Uncle Frank, and he and Uncle Frank thought it was a good plan. They talked to Mr. W. B. Parks, the local underwriting agent for the plaintiff. Mr. Parks was an elderly, highly respected

---

1. Another brother was under an affliction and apparently was not consulted about family matters.

citizen, an old friend of the family, and particularly of the annuitant's deceased husband. He explained to John and Uncle Frank the types of annuity contract that the plaintiff offered, and gave them the premium rates from his rate book.

John talked to the annuitant about it, and she responded favorably. She had previously been considering the purchase of an apartment house recommended by another son, Frank II, for $40,000 to $45,000. After having apparently obtained an expression from his mother that she wished the annuity, John went to Mr. Park's office and told him they were ready to go ahead; and he took Mr. Parks to his mother's residence for him to discuss it and explain the contract to her and obtain her formal application. That was the first time that Mr. Parks had talked to the annuitant about the matter. He explained the two types of contract which he had and she told him which she preferred. John remained with them until the application was prepared and signed by his mother, but he did not participate in the discussion. Mr. Parks inquired specifically about her health, and she said it was good. He had known her for many years, and he said she appeared to be clear in her mind and normal in every respect.

The annuitant's family physician saw her as a patient from time to time during the preceding five years; and his services and treatments are outlined above. He saw no indication of mental weakness, except she would not follow his instructions, which the Court, from common knowledge, is convinced does not reflect mental trouble.

She is shown to have developed certain eccentricities and pecularities, such as carelessness about her person and her clothes and she would leave her home sometimes on bad days without a rain coat or umbrella, but these would not indicate any mental incapacity to transact business. She maintained her own bank account and looked after such business affairs as she had, usually consulting with one or more of her sons.

She never took any psychiatric treatment after she left the Baltimore hospital in March 1942, but remained at her home in Cleveland until her death. Her husband during his lifetime was active in church and in public activities, and her husband and she attended Kiwanis Ladies Night meetings, and during World War II they spent most of the Sunday evenings with Mr. and Mrs. Parks. Mr. Parks knew about the annuitant being in the hospital at Baltimore, and understood it was for some nervous trouble. Mr. Parks thought her health was much better after the war.

From the foregoing, the Court of necessity must conclude that the annuitant acted freely, voluntarily and understandingly when she executed the annuity contract, and there appears no mental impairment or other equitable ground upon which a rescission of the contract can be directed.

The contract itself was entered into by the plaintiff in good faith, without any fraud, imposition or undue influence, and upon its regular terms and for its established premium. As viewed at the time, it was a beneficial contract for her, or so she and the responsible members of her family thought. Her son, John, said it might not have been a desirable contract for someone else, but for her it was. It undoubtedly would have been had she lived up to or beyond her age expectancy.

The defendants, as co-administrators of the annuitant's estate, who would presumably be beneficiaries of the rescission of the contract, are in the attitude of attacking the very contract which was recommended by one and acquiesced in by the other. No complaint was made by anyone until the untimely death of the annuitant. And it seems unreasonable to believe that the sons and the uncle would have permitted the annuitant to make the contract had they had any suspicion of insanity.

■ The contract cannot be condemned because the annuitant died so soon after it was made, no more than would an insurance contract for $40,000 which became a claim after payment by the insured of the first premium. What appears to be a fair bargain when made cannot be interfered with by court because it later turns out to be a bad bargain for one of the bargainors. This is elemental.

■ "The mere fact of insanity, however, even when clearly proved, does not seem to be enough to authorize a court of equity to cancel a contract or instrument executed by such person in the absence of some other equitable ground. For example, if the contract is made in good faith and is manifestly to the advantage of the person non compos mentis, a court of equity will not set it aside. * * * A degree of mental weakness that is consistent with an understanding of the nature of the transaction, and is unaccompanied with any inequitable incident, is not a ground for cancellation." 12 C.J.S., Cancellation of Instruments, § 26, page 976, section 26; Cf. Tally's Executors v. Smith, 41 Tenn. 290.

The following announcement is made in the terse language used in Restatement of the Law in discussing manifestation of assent to contract, under Contracts, section 20a: "That is, there must be a conscious will to do those acts; but it is not material what induces the will. Even insane persons may so act; but a somnambulist could not."

However, the Court is of the considered opinion that the annuitant was not insane at the time she made the contract and that there is no substantial evidence to submit to the jury on this question.

The Court is of the opinion that the plaintiff's motion for a directed verdict made at the close of all the evidence should have been sustained and pursuant to Rule 50(b), Federal Rules of Civil Procedure, said motion will now be sustained.

Order accordingly.